No. 5939.

EX PARTE WILL SUDDATH.

HABEAS CORPUS FOR BAIL—FACT CASE.—See the statement of the case
for evidence *held* insufficient to authorize a refusal of bail—murder being
the charge against the relator.

HABEAS CORPUS on appeal from the District Court of Tarrant.
Tried before the Hon. R. E. Beckham.

The relator in this case was held under an indictment charg-
ing him with the murder of John Crisman, in Tarrant county,
Texas, on the thirteenth day of February, 1888. He was refused
bail by the judge below and prosecuted appeal to this court,
which reverses the judgment, and awards bail in the sum of five
thousand dollars.

Dr. C. C. Murphfree was the first witness for the relator. He
testified that he was a practicing physician, resided in the town
of Mansfield, Tarrant County, Texas, and witnessed the diffi-
culty in that town between the relator and Crisman, which re-
sulted in the killing of the latter by the former. When the
difficulty began, the witness was standing on the west side of
the street, in front of Mr. T. C. Graves's store, which was about
one hundred and twenty-five feet southwest from the parties.
The quarreling of the parties first attracted the attention of the
witness. He could hear their voices but could not distinguish
the words spoken by either. The parties were in front of Cris-
man's store. They continued to quarrel until Bob Coleman ap-
peared on the scene. Coleman interfered by seizing Crisman
and pushing him up against the window of his, Crisman's, store,
when the shooting began, the shots following each other with
great rapidity. Witness could not tell which of the combatants
fired the first shot. The relator fired two shots while Crisman
was falling. When the firing began the relator was standing a
few steps south of Crisman, and when it ended he was standing
about the same distance north of Crisman. Crisman fell face
downward, on the plank sidewalk immediately in front of his
store door, which was on the east side of the street. Witness
examined Crisman's body soon after his death, and found that
three balls had taken effect. One ball grazed his chin, passed

through three folds of skin into the neck, ranged downward and did not pass out. The second ball struck about two inches above the crest of the hip bone, six inches from the spinal column, and to the rear of the lateral or axillary line, and on the left side of the back. The third ball entered about six inches above the crest of the hip bone, about the same distance from the spinal column and lateral or axillary line, as the second ball mentioned. One of the balls passed through the body, making its exit a few inches above and in front of the crest of the right hip bone. Another of the balls passed through the body and lodged just under the skin of the right nipple. Witness cut that ball out. The other ball which passed through the body was found in Crisman's clothes. Crisman's pistol, which the witness saw, was a weapon of thirty-eight calibre; the relator's, according to witness's information, was a weapon of forty-four calibre. Crisman was a taller man than the relator. Witness saw a thirty-eight calibre bullet hole in the weather boarding of Crisman's store, eight or nine feet above the side-walk floor. He also saw a somewhat larger bullet hole in the planking of the sidewalk near the place where Crisman fell. Crisman's pistol scabbard was in the front part of his pants, on his left side.

Howard Wright testified, for the relator, that he saw the fatal difficulty between the relator and Crisman, which occurred between ten and eleven o'clock on the morning of February 13, 1888. Witness was standing on the sidewalk in front of his store, which was on the same side of the same street that Crisman's store was on, and about one hundred and twenty-five feet distant in a north direction. The stores of Smith & Harrison and of Mr. Weaver were between the stores of witness and Crisman. Witness went down the street a few minutes before the difficulty, and on his return to his store, he passed immediately in front of Crisman's store. In passing, witness observed Crisman standing at the outer edge of the sidewalk in front of his store, with one foot resting on a bench that stood between two of the sidewalk posts. He was talking to Mr. Battle about being shot at a night or two before, and showing him a bullet hole in his coat, the result, it was understood, of that shot. Witness spoke to Crisman as he passed, and a few steps up the street he met the relator, who was smiling, coming down the street. Witness had heard of defendant being in town, but had not seen him up to that time. Relator spoke

pleasantly to witness, just as witness stopped in front of Weaver's store to talk to Taylor Ridge, and passed on. Witness soon went on to his store, and just as he reached the front door his attention was directed to quarreling in front of Crisman's store. He then saw that Crisman was about in the same position he was when witness passed him, facing the street, with his back to his store, and his foot on the bench. Relator was then standing in the street, six or seven feet from the sidewalk, facing Crisman. Both the relator and Crisman were talking loudly and gesticulating violently, and witness judged from their excited manner that they were quarreling. He could not distinguish the words uttered by either of them. The two men maintained the positions described for a few minutes, when the relator stepped to the sidewalk in front of Crisman's store door. The only change made by Crisman in his position was to turn to face the relator. Then they quarreled for a few moments, when their voices became lower and their gesticulation less violent, and witness thought the quarrel was about to subside. About that time Constable Bob Coleman arrived upon the scene and stepped between the contending parties. That act of Coleman's seemed to enrage both the relator and Crisman—at least, the quarrel became instantly violent, and one of the parties, witness did not know which, passed the d—n lie to the other, and it appeared to witness the parties attempted to make a "pass" at each other. Coleman then threw both arms around Crisman, and threw him against the wall of the store. Witness could not then see what the relator was doing, as his view was obstructed by Coleman and Crisman. Very soon after Coleman caught Crisman, witness saw Crisman's pistol pointing over Coleman's arms, and about that time the pistols of the relator and Crisman were discharged. The shots were so near together that witness could not undertake to say which preceded the other. Coleman seemed to knock Crisman's pistol up just as it fired. Four or five shots were fired in all. The home of the relator was in Henrietta, Clay county, Texas. He attended school in Mansfield three or four years before the homicide. He spent most of his time during this visit, at the house of Dick Runyon. Crisman married Miss Rawls some time during the year 1887, but at the time of his death was suing her for divorce upon the ground of infidelity. Mrs. Crisman, nee Allie Rawls, was a sister of Jim Rawls, a witness in this case, and was a sister-in-law of Dick Runyon.

B. L. Jenkins was the next witness for the relator. He testified that he lived in Mansfield, Texas, and was engaged in the grocery business for Pyles & Morrison. The store of Pyles & Morrison was situated about one hundred and fifty feet northwest from the store of Crisman, in front of which the fatal difficulty took place. Witness was standing in front of his store door when the quarreling began. He heard it, but could not distinguish any of the words said by either of the parties. Witness's back was turned when the first shot was fired, and he did not see it. Witness turned toward the parties about the time the third shot was fired, at which time Coleman had hold of Crisman, who appeared to be falling. The shots were fired in very quick succession, the longest interval, which was very brief, occurring between the second and third shots. The relator, who lived in Henrietta, attended school in Mansfield about two years before the homicide. Miss Allie Rawls, afterward the wife of John Crisman, the deceased, attended the same school at the same time as the relator, and was the intimate friend and reputed "sweetheart" of the relator. To all appearances the relator and Miss Allie Rawls, when school mates, were in love with each other. Miss Allie Rawls was a very pretty girl. Relator, while on this visit to Mansfield, stayed at the house of his friends, part of the time with John Graves. When witness first met relator on this visit, he told witness that he was going to stay at Dick Runyon's house.

James Yeates testified, for the relator, that he lived at Mansfield, but did not see the fatal difficulty. The witness had no personal acquaintance with the relator, but knew him by sight and saw him at the railroad depot on Sunday, the day before the killing of Crisman. At about ten o'clock on Thursday night preceding the killing, Crisman came to witness's store and waked him by knocking at his door. Witness admitted him at the back door. He appeared to be very much excited, and said that somebody had just fired at him in his room through the window. He then showed witness a hole in his coat, which looked like, and which he said was, a bullet hole. On the next morning witness examined the window of Crisman's sleeping room, and found a bullet hole in it. He also saw a bullet hole in the ceiling of Crisman's sleeping room. Witness slept in the east end of his store, which was about twenty feet south of Crisman's store and on the same side of the street.

Bob Coleman testified, for the relator, that he was the consta-

ble of the Mansfield precinct in Tarrant county. The witness was in the city of Fort Worth on the night of Thursday preceding the killing of Crisman. He went into the White Elephant saloon in Fort Worth, on that night, and found the relator in there playing billiards with Dick Runyon. Witness stayed in the saloon for a short while and then went to the opera. He met the relator after the opera was over and remained with him throughout the night. Witness next saw the relator on the following Saturday evening in Mansfield. Witness was then on his way home, and saw the relator with Mrs. John Crisman and Mrs. Rawls, who was Mrs. Crisman's mother, walking ahead of him. Relator turned and spoke to witness, and then walked on with Mrs. Rawls and Mrs. Crisman towards the railroad track until they turned off towards the house of Dick Runyon. The train from Fort Worth had just passed on when witness saw the parties. He had not previously seen relator in Mansfield for several days. On the next Monday morning, which was February 13, 1888, witness, when he came into town, saw the relator and Crisman standing in front of Crisman's store, quarreling. Thinking a row between them imminent, witness went to them. They were facing each other when witness reached them, and Crisman was cursing the relator. Witness heard relator say to Crisman: "John, I understand you called me a d—d liar at the postoffice." Crisman, who then had his right hand in his pocket, replied: "I did call you a d—d liar, and you are one." Witness thereupon seized Crisman and shoved him back, and in doing so pulled Crisman's hand from his pocket. His hand was empty. Crisman then made a strong effort to release his arm from the grasp of witness, succeeded finally, and immediately thrust his hand into his pocket, drew his pistol and fired. Relator returned the fire at once. While struggling with Crisman witness had his back towards relator and could not, of course, see what he was doing during that time. Witness turned at the sound of the second shot, which was fired by the relator, and saw the relator's pistol pointing apparently at him. Fearful of being shot himself, witness leaned his body over as far as he could, and the relator fired his second shot. Witness at once released Crisman, who began to stagger and fall. Relator then stepped north, which was east of Crisman, and fired again. Witness then seized the relator, when the relator threw his arm over the witness and fired the last shot. This last shot was fired about the time that Crisman fell, face down, to the pavement.

Witness then disarmed and arrested the relator. Relator's pistol was a forty-four calibre weapon. When witness seized Crisman, he seized him by the hand, and shoved him against the window of his store. Witness did not hear the relator curse Crisman at any time during the difficulty. Relator had his hands down by his sides during the quarrel which preceded the shooting. Both Crisman and the relator had told the witness about the quarrel which they had at the postoffice a few weeks before. Relator never in the presence of the witness, uttered any threats against Crisman. Witness did not know, before he came up on them, that Crisman and the relator were going to have a quarrel. Witness was friendly to both Crisman and the relator at the time of the killing. Mansfield was about twenty miles distant from Fort Worth. It was between eight and nine o'clock when witness saw the relator in the White Elephant saloon in Fort Worth, on the Thursday night preceding the homicide. It was about eleven o'clock on the same night when, having left the opera he again saw relator in Fort Worth. The relator rested.

Melville Hard was the first witness for the State. He testified that he was acquainted with the relator, and attended the Mansfield school with him for two months, about two or three years before this trial. Witness saw the relator in the city of Fort Worth on the Thursday preceding the killing of Crisman. He first met the relator on that evening between seven and eight o'clock on the public square of Fort Worth, and saw him again after midnight in the White Elephant saloon. He then asked witness "how things were getting along in Mansfield." Witness replied that they were getting along "all right," when relator remarked to witness that he had had some trouble and expected more. He did not say with whom he had had the trouble, nor where he had it. Tom Allen was present, and, the witness thought, heard this conversation. Sam Poole, Willie Percy and Charles Murphy were also in the saloon, but were ten or fifteen feet distant from relator when the relator made the said statement to witness. Witness and Tom Allen next saw the relator about ten o'clock on the next morning, near Gallaway's saloon in Fort Worth. No conversation passed between witness and relator on that occasion.

Tom Allen testified, for the State, that he was in Fort Worth with Melville Hard on Thursday night and Friday morning preceeding the killing of Crisman. Witness heard relator, about

nine o'clock on said Friday morning, in front of Gallaway's saloon, in Fort Worth, ask Hard "how things were getting along in Mansfield." Hard replied that "they were getting along all right," when relator said: "By God, things are not getting along all right with me. I have had some trouble, and I may have more." The witness, with Melville Hard, Willie Percy, Charles Murphy and Sam Poole, was in the White Elephant saloon, in Fort Worth on the night before (Thursday), and saw relator in the saloon, but did not hear or see him say anything to Hard. If anybody had sworn on this trial that the relator told him, witness, and Hard, at the White Elephant saloon, on Thursday night, that he had had trouble and expected more, such person had testified to a falsehood.

John Welch testified, for the State, that he was in Bills's drug store, in Mansfield, on the night of the Saturday preceding the homicide, watching the operations of a phrenologist on the heads of several boys. The relator and Crisman were both in the drug store, and the fact that they watched each other closely and constantly attracted the attention of the witness. They watched each other critically until Crisman left the drug store by the front door. Within a short time the relator left, going out of the same door. Witness then went to the door and looked up the street, the way they went, to see if anything happened. Relator was a stranger to the witness.

Joseph Smith testified, for the State, that he was a member of the hardware firm of Smith & Harrison, who did business in the house next to and north of the house in which Crisman did a dry goods business. Weaver's store, in which Jim Rawls, the brother of Mrs. John Crisman, was a clerk, was immediately north of witness's store. Witness was in his store when Crisman was killed. About forty minutes before the killing occurred, the witness observed Jim Rawls about sixty yards off, walking rapidly towards Dick Runyon's house, which was between a quarter and a half a mile east of witness's store. Just before he observed Jim Rawls going towards Runyon's house, he saw Mr. Frank Crisman, the father of the deceased, and the deceased's brother Willie, leave the east end of Crisman's store, and go off toward the Crisman home. Mr. Frank Crisman was driving a wagon loaded with wire, and Willie Crisman was carrying a spade. Twenty or thirty minutes after he saw Jim Rawls going toward Runyon's house, the witness saw the said Rawls returning with the relator towards Weaver's store. They

went east towards the back end of the said Weaver's store. Ten minutes later the relator passed the witness's store, going down the sidewalk toward Crisman's store. Witness soon heard "grumbling" in front of Crisman's store, and although then engaged in waiting on a customer, he went to his door and saw Crisman and relator facing each other and quarreling. Crisman stood at the edge of the sidewalk, facing relator, with his foot on a bench and his back north, towards witness. The witness heard the relator say to Crisman: "John, you havn't got a d—d bit of sand in you!" The quarrel seemed to subside about this time, and witness went back behind his counter and finished serving his customer. While changing some money the witness heard the cracking of Crisman's window pane, followed immediately by shooting. The first two reports were loud ones. The third was a much weaker report, and the last two were loud reports like the first two. When witness got out of his store Crisman was dead. Witness then saw a bullet hole —about thirty-eight inch caliber—in the weatherboarding on the front of Crisman's store, eight or nine feet above the floor of the sidewalk. He also saw a larger bullet hole in the floor of the sidewalk, near where the body of Crisman had fallen. Witness knew the relator by sight, and was well acquainted with Crisman. He knew the feeling between Crisman on the one side. and Rawls and Runyon on the other, was bad. Crisman, at the time of his death, was suing his wife, the sister of Rawls, and the sister-in-law of Runyon, for divorce upon the ground of her infidelity. Witness went to Crisman's sleeping room on the Friday morning preceding the homicide, and was shown the hole in the ceiling, made, it was said, by a ball fired through the window at Crisman on the night before. Witness took a line and drew it taut from the hole in the ceiling through the hole in the window, made by the ball in its passage, and by that means found the point where a man would have to stand to fire a pistol and make the two bullet holes. At that point he found two foot tracks measuring each ten and one eighth inches. He found the same tracks at one or two other points, which indicated that the party leaped from the place where he stood and fired the shot, and then ran. While in Crisman's room on that morning, witness picked up from the floor, where it had evidently fallen from the ceiling, a battered forty-five caliber ball.

E. J. Dunn testified, for the State, that he was in W. B. Dunn's grocery store when the killing of Crisman occurred, and

he did not see it.   Dunn's store was just below Crisman's store.
Witness saw old man Crisman and Willie Crisman leave Crisman's, store on the fatal morning, and about thirty minutes
later he saw the relator and Jim Rawls going into Weaver's
store through the back door.   Soon after this the witness went
to the front door of Dunn's store, and, looking up the street, he
saw the relator and Jim Rawls standing in Weaver's front door,
looking down the street towards Crisman, who was standing on
the sidewalk in front of his store.   Rawls and the relator appeared to be then in a close conversation.   Witness then went
back into the store, and was behind the counter when the shooting occurred.   Witness denied that he ever told Doc House that
if he knew anything in the relator's favor he would not swear to it.
The witness was at the Mansfield depot on the evening of Wednesday, January 11, 1883, when the relator, Mrs. Crisman and
her mother got off the train and went together towards Dick
Runyon's house.   On the next evening witness was in Crisman's
store when the relator entered it.   Crisman said to relator:
"Will, when did you come in?"   The relator replied:   "I came
in from Dallas this morning, by way of Waxahachie."   Witness
then told Crisman that the relator came in on the train from
Fort Worth on the evening before, with old lady Rawls.   Witness was well acquainted with the relator, and exchanged greetings with him when he got off the train on Wednesday evening,
January 11, as stated.

M. E. Kizziar testified, for the State, that he left Pyles & Harrison's store to go to Wright's store, across the street and immediately opposite Pyles & Harrison's, just before the fatal shots
were fired.   Just as he reached Wright's store his son Mark,
who was there, told witness to "look out," as he thought there
was going to be a fight across the street.   Witness looked down
the street and saw the relator and Crisman facing each other,
quarreling.   He heard the d—n lie pass, and then saw Coleman seize Crisman and push him back against the window.
Relator at that point of time fired the first shot at Crisman.
His second shot was fired at about the time that Crisman fired
his first and only shot.   It appeared to witness, who was about
ninety feet distant from the parties, that Coleman knocked
Crisman's hand up when he fired.   Mark Kizziar testified, for
the State, substantially as did his father, except that he thought
that Crisman fired the third shot.   Crisman and the relator

both had their right hands in their pockets when Coleman interfered.

Dave Nelson testified, for the State, that he was in Mansfield on the fatal day, and saw the killing of Crisman by the relator. While witness was in front of Graves's dry goods store, his attention was called to the quarrel then in progress between Crisman and the relator. Witness walked toward Bills's drug store, and had reached a point about midway between Bills's and Graves's stores, when he saw Coleman seize Crisman and turn his left side to the relator, who immediately shot Crisman twice. Crisman got out his pistol and fired as he was falling. Witness thought Coleman turned Crisman to walk off with him. Relator stepped forward a step or two when he fired his first shot.

J. H. Battle testified, for the State, that a very short while before the killing of Crisman, Herbert Matthewson opened a conversation with Crisman about the shot that was understood to have been fired at Crisman a few nights before. Matthewson soon left, and witness took a seat on the bench at the edge of the sidewalk in front of Crisman's store. Crisman stepped to the edge of the sidewalk and placed his foot on the bench and entered into a conversation with witness. Within a few minutes Taylor Ridge came along and asked Crisman to show him how near the would be assassin of a few nights before came to "getting his meat." Crisman replied that he did not then have on the coat through which the bullet passed. Crisman then remarked that the man who fired that shot at him was a cowardly son of a bitch and would not dare to face him. Ridge passed on up the street, and Crisman again remarked that whoever fired that shot at him was a "mammy f——g son of a bitch." About this time the relator was passing the witness and Crisman. He turned after taking a few steps and asked Crisman: "John, do you mean that for me?" Crisman replied: "If you are the man who did the shooting, I mean it for you." Relator replied: "I am not the man." Crisman then said: "You are excusable, then; but if you are not the man, why in the hell did you take it up?" The relator then stepped to the sidewalk faced Crisman and said to him: "I understand that you have accused me of shooting at you the other night." Crisman replied: "The man who says I have accused you is a d—d liar." From this point the quarrel became general, both parties gesticulating violently with their right hands, and each passing the d—d lie several times. Presently Coleman seized Crisman and pushed him

back, and as he did so the relator took a step backward, drew his pistol from the waistband of his pants on the right hand side and fired. He fired the first two shots. Immediately after he fired his second shot, Crisman got his hand loose from Coleman, drew his pistol, and fired his only shot just as Coleman knocked his hand up. Coleman then released Crisman, who began to fall. Relator then stepped to a point east of Crisman and fired again. Coleman then caught the relator, and relator fired his fourth and last shot just as Crisman fell on his face. He was nearly over Crisman when he fired the last shot. Relator then tried to escape, but was disarmed by Coleman and taken into Crisman's store.

J. D. Evans, postmaster at Mansfield, testified that the relator and Crisman met in the post office on the morning of January 14, 1888, when Crisman said to the relator: "You think you played it d—d fine on me the other day. I caught on to your little racket." The relator replied: "It's nobody's business if I did." Crisman then said: "That's all right," and the relator replied: "It had better be all right." Crisman then left, and the relator remarked to the witness: "If he thinks it makes a d—d bit of difference to me he is very much mistaken." Witness heard nothing else that ever transpired in the post office between the relator and Crisman.

Lem Perry testified, for the State, that he saw the shooting of Crisman by the relator, and that the relator fired the first two and the last two shots.

The State closed.

Mr. Weaver was the first witness introduced by the relator in rebuttal. He testified that on Sunday, the day before the homicide, he went with Jim Rawls to the house of Dick Runyon. While there old lady Rawls, the mother of Jim, asked him, Jim, to come to Runyon's house on the next morning to escort her to, and see her on, the Fort Worth train. A while before train time on the next morning, which was about twenty minutes after ten o'clock, witness told Jim Rawls that if he was going to see his mother off on the train, he had better be at it. Jim Rawls then left witness's store to go to Runyon's house. About an hour later Jim Rawls came back to the store with the relator, which was the first time that the witness had seen the relator. Relator stayed in the store a short while, and left, saying that he was going across the street to see John Graves. A few minutes later witness heard loud talking down the street.

He went to the door and saw the relator and Crisman facing each other and quarreling. He heard Crisman say, and repeat, two or three times, that "Whoever he is, he is a God d—d mammy sucking son of a bitch." Relator asked Crisman: "John, do you mean that for me?" Crisman replied: "If you are the man, I mean you." Relator said: "I am not the man; am I excusable?" Crisman said: "That's all right, by God!" Relator then said to Crisman: "John, if you will give me time I will prove to you that I am not the man." Crisman replied: "Get your proof, and get it d—d quick!" Relator then said: "John, I don't want to have a fuss with you." Crisman answered: "God d—n you, you haven't got grit enough! Make your break, God d—n you; I am ready for you!" This manner of quarreling was kept up for about five minutes, when Coleman appeared, got between and pushed the parties apart, with the remark: "Gentlemen, you can't have a fuss here." Relator turned clear around, and Crisman fell against his window. As he recovered himself, Crisman drew his pistol. Coleman, using his left hand, knocked Crisman's hand up, and with his right hand he knocked at the relator's hand, and both pistols—that of relator and that of Crisman—fired so near together that wit nesss could not tell which, if either, fired first. It then looked to witness like relator was going to shoot Coleman, and when, at another shot, Coleman dropped or bent down, witness thought he was killed, and so remarked to Jim Rawls at the time. The relator continued to shoot until he was disarmed by Coleman. The witness had never heard Jim Rawls say anything against Crisman, but knew that his feeling for Crisman, and that of Crisman for him, was not good. If the relator cursed Crisman during the quarrel, the witness did not hear it. Relator was much cooler throughout the difficulty than Crisman.

Walter Luttrell testified, for the relator, in rebuttal, that he saw the shooting, but at that time did not know either the relator or Crisman. He was standing on the opposite side of the street, and saw and heard the quarreling. After a short time Coleman appeared on the scene and pushed the parties asunder. Crisman then drew his pistol and the shooting began.

Mr. Berry testified, for the relator, in rebuttal, that he lived in Dallas county, but was in Mansfield on the day of the homicide and saw it. The man who was killed was the man who first drew a pistol, and who fired the first shot.

Mrs. Rawls was the next witness for the relator. She testified

that she was the mother of Jim Rawls, Mrs. Dick Runyon and Mrs. John Crisman, nee Allie Rawls. Allie Rawls and the relator were school mates in 1884, and the witness believed were engaged to be married to each other when the relator left school in 1885. Allie Rawls and John Crisman were married in May, 1887. Allie and relator corresponded before but not after Allie's marriage to Crisman. Crisman and Allie lived together about three months after their marriage, when they separated, and Crisman, alleging infidelity against Allie, brought suit against her for divorce, which suit was pending at the time of the homicide. Allie got Mr. John Graves to write to the relator to attend court and testify in her behalf on the trial, which was set for January 9, 1888. Witness and Allie were advised, in response to that letter, that the relator would attend the trial and testify as requested. On the morning of Monday, January 9, 1888, the witness, who then lived in Fort Worth, met the relator on the streets of Fort Worth and invited him to go home with her, which he did. On reaching the house it was ascertained that Allie was at the house of a neighbor. Relator, while waiting for the return of Allie, got to looking through an album. He found one of Allie's pictures in the album, asked for it, and witness gave it to him. He put the picture in his pocket, and soon afterward Allie returned from the neighbor's, when witness, according to Allie's statement, told her that she had given the picture to the relator, but it was witness's recollection that she did not tell her.

Relator frequently visited at the witness's house, and spent several nights there upon witness's invitation. He was the friend of witness and Allie, who, living to themselves, were lonesome. Witness and Allie went to Mansfield on Tuesday evening, January 10. On reaching Mansfield the witness remembered that she had forgotten to lock the doors of her house, and accordingly she went back to Fort Worth on Wednesday morning, and on Wednesday evening she boarded the train to go back to Mansfield. Relator got on the same train and went to Mansfield with witness. On reaching Mansfield they went together to Dick Runyon's house. During that visit to Mansfield the relator stayed at Dick Runyon's house, and at John Graves's house. Witness and Allie spent a week in Mansfield on that visit, and left the relator in that town when they returned to Fort Worth. Witness, relator and Allie went to Mansfield together from Fort Worth on the Saturday before Crisman was killed.

Relator, before starting from Fort Worth, said that he was on his way to Dallas, but would go by Mansfield to see his friends. Witness and Allie went to Mansfield at that time to see Dick Runyon's child, which was very sick. On Sunday witness saw her son Jim at Runyon's, as stated by the witness Weaver, and told him to attend her to the depot on Monday morning. Jim came to Runyon's for the witness, but witness changed her mind and did not go, as Runyon's child had grown worse. Neither the witness nor Allie ever wrote to the relator about appearing as a witness for Allie on the trial for divorce. As stated, John Graves wrote to him about that matter.

Mrs. John Crisman, the widow of the deceased, was the next witness for the relator. She testified substantially as her mother did, and in addition, that the relator was in no way connected with her separation from her husband. She and the relator were friends as schoolmates, and corresponded in 1885, prior to her engagement to Crisman. She never had any communication with the relator after she became engaged to Crisman until relator came to Fort Worth to testify for her on the trial for divorce.

Jim Rawls testified, for the relator, substantially as did the witness Weaver, and in addition, that he was at home on the Thursday night preceding the homicide. He had a dance at his house on that night, and played the violin himself for the dancers. He was at home throughout that night, and knew nothing about Crisman being shot at, except what he heard reported. Witness's feelings for Crisman were not friendly at that time, because of the false charges brought by Crisman against his wife, who was witness's sister. He never heard the relator speak an unkind word of Crisman, nor did he know that relator and Crisman were not the best of friends until he saw and heard them quarreling just before the shooting. He denied that he stood in Weaver's store door with the relator just before the shooting, or at any other time on that day. He found relator at Runyon's house on that morning, when he went there to escort his mother to the train. When he started back to town, after his mother told him that she had changed her mind about going to Fort Worth, the relator got his hat and prepared to, and did, go back to town with witness. Witness was here shown a letter which, together with a picture of Mrs. John Crisman, was taken from the relator's coat pocket after his arrest. He

recognized the hand writing as that of his sister, Mrs. John Crisman. The letter reads as follows:

MANSFIELD, TEXAS, November 26, 1885.

*Dear Willie:*

For the last time I will trouble you with my letter. I would not trouble you this time, but I can not endure suspense any longer, and it is with a heavy heart that I write this letter. It is hard for me to think, Willie, that you are false and faithless; you, that I thought was the truest and best of men.

Willie, please tell me why you have treated me thus. I think you have cruelly wronged me; but if it has gained any happiness for you, I can bear it a great deal better, for I would sacrifice anything for your happiness.

If you have one idle moment, please answer and tell me why you would not write to me. Has anyone told you anything? Ah! why do I ask such questions? You have only found one you love better. Willie, I have written this letter to tell you you are free. The words pierce my heart like a dagger.

But, Willie, we can not live happily together when love is a stranger on one side. If I could only have your love in return, our future would be a pleasant one; but that is impossible, and the last ray of sunshine has gone from life. I will say farewell.

Forget me not, though I repine,
　Because you found another heart;
Forgive it all, that once was mine—
　I say farewell and part.

Because you found a fairer face,
　A nobler name, a lovelier lot,
I'll meekly bow and yield my place,
　But oh! forget me not.

*Henry M. Furman,* for the relator.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Upon the evidence as contained in the record before us on this appeal, we are of opinion that appellant is entitled to bail. There is no evidence in the record upon

the question of his ability to give bail, and we have therefore had no special data to guide us with reference to the amount.

The judgment refusing him bail is reversed, and he will be released from custody upon his execution of a bond with good and sufficient sureties in the sum of five thousand dollars, conditioned as the law requires.

*Ordered accordingly.*